# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
## CENTRAL DIVISION

| | |
|---|---|
| J & V MANAGEMENT, LLC, an Alabama limited liability company, individually and on behalf of a class of all others similarly situated,<br><br>     Plaintiff,<br><br>vs.<br><br>FERRELLGAS PARTNERS, L.P., a limited partnership; FERRELLGAS, L.P., a limited partnership, also doing business as BLUE RHINO; AMERIGAS PARTNERS, L.P., a limited partnership, also doing business as AMERIGAS CYLINDER EXCHANGE; and UGI CORPORATION, a corporation,<br><br>     Defendants. | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMAND** |

## CLASS ACTION COMPLAINT

Plaintiff, J & V Management, LLC ("Plaintiff"), on behalf of itself and all others similarly situated (the "Class" or "Class Members"), alleges as follows against Ferrellgas Partners, L.P and Ferrellgas, L.P. (*d/b/a* Blue Rhino) (together, "Blue Rhino") and UGI Corporation and AmeriGas Partners, L.P. (*d/b/a* AmeriGas Cylinder Exchange):

# I.     INTRODUCTION

1.      This action concerns anticompetitive conduct by Defendants Blue Rhino and AmeriGas in the distribution and sale of exchangeable portable steel tanks containing propane gas commonly referred to as "propane exchange tanks."

2.      Blue Rhino and AmeriGas (together, "Defendants") sell propane, stored in propane exchange tanks, directly to retailers across the United States, including grocery stores, convenience stores, and gas stations. In the United States, consumers typically use propane exchange tanks to fuel barbeque grills and patio heaters. Defendants' propane exchange tanks are available at tens of thousands of retail locations nationwide.

3.      At all times relevant to this complaint, Defendants were the two largest suppliers of propane exchange tanks in the United States. Blue Rhino controlled approximately 50 percent of the United States wholesale propane exchange tank market; AmeriGas controlled approximately 30 percent of the market. No other competitor served more than nine percent of the market. No other competitor was capable of servicing large national retailers, such as Walmart, Lowe's and Home Depot, except on a limited basis.

4.      In early 2008, Blue Rhino and AmeriGas conspired to raise the price of propane sold in propane exchange tanks by 13%. Defendants concealed their scheme by charging the same price per propane exchange tank, while providing 13% less propane. By conspiring to decrease the fill of the average exchange tank from 17 pounds to 15 pounds, Defendants were able to charge 13% more per pound without increasing the price of propane per tank.

5.      In spring 2008, Blue Rhino decided to increase margins by reducing the amount of propane contained in its exchange tanks from 17 pounds to 15 pounds. Blue Rhino planned to reduce the fill level in its exchange tanks without a corresponding reduction in the wholesale

price. This would have the effect of raising the price per pound of propane to retail customers and likely to the ultimate consumers.

6.     During spring and summer 2008, Blue Rhino informed AmeriGas and certain retail customers that it intended to implement the fill reduction. AmeriGas likewise agreed to reduce its exchange tanks from 17 pounds to 15 pounds without a corresponding price decrease.

7.     In the summer 2008, Blue Rhino and AmeriGas each began to implement the fill reduction.

8.     One significant retailer, the Lowe's chain of home improvement stores, recognized that selling propane exchange tanks with 15-pound fills would place it at a competitive disadvantage as compared to retailers able to sell the tanks at 17-pound fills. Consumers naturally prefer to minimize the number of exchanges they must make as exchanges require time and travel expense, and propane exchange tanks are large, heavy, and cumbersome. Accordingly, Lowe's accepted the fill reduction on the condition that all of Blue Rhino's other customers – including Walmart – would also accept the higher priced, less convenient propane exchange tanks.

9.     When Blue Rhino and AmeriGas attempted to implement their fill reduction scheme, they initially were met with stiff resistance from Walmart. Walmart refused to accept the fill reduction, recognizing that it was a thinly disguised price increase. Because of Walmart's ability to purchase from either Blue Rhino or AmeriGas, neither company could unilaterally implement the fill reduction without risking the loss of Walmart's business to the other. Defendants could implement their conspiracy only by colluding to force Walmart to accept the change.

10.     But Walmart also recognized that it was going to receive a bad deal and resisted. Defendants colluded to force Walmart to accept the fill reduction until eventually Walmart succumbed. Without anyone left with enough market power to fight them, Defendants made the fill changes permanent. Direct purchasers of propane in propane exchange tanks have overpaid for their propane by 13% per pound ever since.

11.     Defendants' conduct has restrained price competition and led to higher prices for propane sold in propane exchange tanks in the United States. As a result of Defendants' conduct, all direct purchasers in the United States, including Plaintiff, were forced to pay a higher price per pound for propane sold in propane exchange tanks than they otherwise would have paid.

12.     The United States Federal Trade Commission ("FTC") has initiated an administrative action to enjoin Defendants from engaging in their illegal conspiracy, which is set for a hearing in Washington, D.C. in December 2014.

## II.     JURISDICTION AND VENUE

13.     This action arises under Section 1 of the Sherman Act (15 U.S.C. § 1), and Sections 4 and 6 of the Clayton Act (15 U.S.C. §§ 15 and 26).

14.     This Court has subject matter jurisdiction over this action pursuant to Sections 4 and 6 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.

15.     Venue is proper in this District pursuant to 15 U.S.C. § 15(a) and 28 U.S.C. § 1391(b), (c) and (d). Defendants conduct business in this judicial district, and they reside in this division and district, with corporate offices both in and around Jefferson City. In addition, unnamed class members purchased propane in propane exchange tanks for resale throughout the Central Division of the Western District of Missouri. These resale locations are listed on both the     AmeriGas     and     Blue     Rhino     websites.     *See*     AmeriGas     locations     at

http://www.amerigas.com/find-amerigas-propane-locations/ and Ferrellgas/Blue Rhino locations at http://www.bluerhino.com/Tank-Exchange/Find-a-Rhino-Location.aspx. Further, Defendant AmeriGas has its registered agent in Jefferson City, within the Central Division of the Western District of Missouri.

## III.    PARTIES

### Plaintiff

16.    Plaintiff, J & V Management, LLC ("Plaintiff"), is a limited liability company organized under the laws of the State of Alabama. During the class period, Plaintiff directly purchased propane in propane exchange tanks from AmeriGas.

### Defendants

17.    Defendant Ferrellgas Partners, L.P., is a limited partnership organized, existing and doing business under and by virtue of the laws of the State of Delaware, with its principal place of business located at 7500 College Boulevard, Overland Park, Kansas. It maintains a nearly complete interest in and conducts its business activities primarily through Defendant Ferrellgas, L.P.

18.    Defendant Ferrellgas, L.P., is a limited partnership organized, existing and doing business under and by virtue of the laws of the State of Delaware, with its principal place of business located at 7500 College Boulevard, Overland Park, Kansas. It resides in this district, with an office location at 12415 Renz Farm Road, Jefferson City, MO. Ferrellgas, L.P., doing business as Blue Rhino, operates a national propane distribution business and owns or has access to distribution locations nationwide. Its business includes the filling, refilling, refurbishing, sale and distribution of propane exchange tanks under the Blue Rhino name. Blue Rhino's propane is

sold to consumers at more than 43,000 retail locations nationwide through its exchange tank service.

19.     Defendant AmeriGas Partners, L.P., is a publicly traded master limited partnership, organized, existing, and doing business under, and by virtue of, the laws of the State of Delaware, with its office and principal place of business located at 460 North Gulph Road, King of Prussia, Pennsylvania. AmeriGas Partners, L.P., operates a national propane distribution business through its subsidiary, AmeriGas Propane, L.P.

20.     Defendant AmeriGas Partners, L.P., through AmeriGas Propane, L.P., is engaged in the marketing and sale of propane and propane supply related services, including the distribution and supply of bulk propane to residential, commercial, and agricultural customers, and the preparing, filling, distributing, marketing, and sale of propane exchange tanks. AmeriGas Propane, L.P. often does business as AmeriGas Cylinder Exchange when preparing, distributing, marketing, or selling propane in propane exchange tanks. AmeriGas resides in, and does business in and around Jefferson City, with a location at 2727 W. Main Street, Jefferson City, MO.

21.     Defendant UGI Corporation is a corporation, organized, existing and doing business under and by virtue of the laws of the Commonwealth of Pennsylvania, with its office and principal place of business located at 460 North Gulph Road, King of Prussia, Pennsylvania. UGI Corporation is the parent and sole owner of AmeriGas Propane, Inc. AmeriGas Propane, Inc. is the general partner of Defendant AmeriGas Partners, L.P., and is a corporation organized, existing, and doing business under and by virtue of the laws of the Commonwealth of Pennsylvania, with its office and principal place of business located at 460 North Gulph Road, King of Prussia, Pennsylvania.

## V.    OVERVIEW OF THE PROPANE EXCHANGE TANK MARKET

22.     Propane is a clean-burning, colorless gas. Propane exchange tanks are commonly used to operate, among other things, gas grills, patio heaters, outdoor fireplaces and mosquito traps.

23.     Propane exchange tanks have a maximum capacity of 25 pounds, but pre-2002 safety regulations forbade filling such tanks beyond 80 percent of their capacity, *i.e.*, 20 pounds. Accordingly, the tanks commonly are called "20-pound tanks" (regardless of the amount of fuel they contain).

24.     Beginning in 2002, the National Fire Protection Association modified its standards to require that propane exchange tanks be equipped with an overfilling protection device ("OPD"). Thereafter, Defendants adopted the custom of filling their propane exchange tanks with 17 or 17.5 pounds of propane—a reduction from the previous 20-pound fill.

25.     Propane exchange tanks sold in the United States are highly standardized products consisting of a standardized tank and a standardized valve system. Propane and propane exchange tanks are homogeneous and functionally interchangeable products; and Defendants, their competitors, and the retailers who sell propane in propane exchange tanks treat them as such. Consumers can exchange any propane exchange tank (regardless of brand) at any store that carries propane exchange tanks without regard for which company supplied the tank to be exchanged.

26.     Retailers (*e.g.*, home improvement stores, hardware stores, mass merchandisers, supermarkets, convenience stores and gas stations) typically sell propane to consumers in propane exchange tanks. Retailers who sell propane exchange tanks usually offer consumers the

option of purchasing a prefilled tank in exchange for an empty tank, or, for a higher price, a prefilled tank without returning an empty tank.

27.     To serve retail outlets that sell propane in propane exchange tanks, Defendants and their competitors need access to refurbishing and refilling facilities, where empty tanks can be cleaned, refurbished, repainted, and refilled. Beginning in or about 2006, Defendants entered into a series of "co-packing agreements." Pursuant to these agreements, each company agreed to refurbish and refill propane exchange tanks for the other company at certain of each company's facilities. Today, each Defendant processes slightly less than ten percent of the other company's used, empty tanks pursuant to co-packing agreements. Blue Rhino refurbishes and refills exchange tanks for AmeriGas at Blue Rhino facilities in Florida, Colorado, Washington and Missouri. AmeriGas refurbishes and refills exchange tanks for Blue Rhino at AmeriGas facilities in California and New Hampshire.

## VI.     ANTICOMPETITIVE CONDUCT

28.     Pursuant to their co-packing agreements, Defendants could, and did, exchange competitively sensitive information, which exchanges had the purpose, tendency and capacity to facilitate price coordination among competitors.

29.     In early 2008, there was a spike in input costs for propane exchange tanks. These inputs costs included the costs for propane, steel for the propane tanks, and diesel fuel for delivery trucks.

30.     In or around January 2008, Defendant AmeriGas conceived a plan to maximize its profits by charging a higher price per gallon of propane through a reduction in the fill level of its propane exchange tanks. AmeriGas decided not to pursue its fill-reduction plan because, among other reasons, AmeriGas believed it would be competitively disadvantaged if other companies in

the industry did not follow its lead by also reducing the fill level in their propane exchange tanks. Only by stifling competition could AmeriGas realize its price increase.

31.     In April 2008, Blue Rhino management approved a proposal to reduce the fill level in the company's propane exchange tanks from the then-standard 17 pounds to 15 pounds of propane, without a corresponding price reduction. Blue Rhino did so to ensure that they maximized profits. The Blue Rhino proposal included a plan to inform AmeriGas in advance of the proposed fill reduction. The fill level reduction proposed by Blue Rhino would effectively serve as a 13% increase in the per-pound price of the propane purchased by Plaintiff and the Class.

32.     Blue Rhino understood that unilaterally reducing the fill level in its exchange tanks risked competitively disadvantaging the company if its principal competitor, AmeriGas, did not also reduce fill levels. Blue Rhino was particularly concerned about its competitive standing with its second largest customer, Walmart, because Walmart purchased propane in propane exchange tanks from both Blue Rhino and AmeriGas.

33.     Walmart is the largest propane exchange tank retailer in the United States. Blue Rhino services approximately 60 percent of the Walmart locations nationwide, while AmeriGas services approximately 35 percent. Ozark Mountain Propane Company ("Ozark"), a smaller regional propane supplier, services the remaining Walmart locations.

34.     The Blue Rhino Director of Strategic Accounts responsible for the Walmart account reported to his manager that the fill reduction could put Blue Rhino at a competitive disadvantage in relation to AmeriGas. He stated:

> "[I]n my mind the 'watch out' is the competitive difference between [Blue Rhino, AmeriGas] and Ozark. We are offering less product vs. [Walmart's] other 2 suppliers. . . . Once we explain this is a done deal (and that we are not asking for [Walmart's] input or letting him decide), he may become resentful and threaten to

take states. . . . Then, we need to pray that [AmeriGas] takes a similar move as soon as possible. If [AmeriGas] doesn't move, we will have a BIG issue."

He elaborated:

"The only thing that can make this go away is if AmeriGas goes to 15 as well, but it has to happen very soon after us to legitimize our move."

35.     On or about April 22, 2008, Blue Rhino decided to inform Walmart of its fill reduction plan.

36.     On or about April 28, 2008, Blue Rhino's Director of Strategic Accounts met with the Walmart buyer and announced Blue Rhino's intention to reduce the fill in its propane exchange tanks. Walmart rejected the proposed fill reduction. Walmart's buyer told the Blue Rhino Director of Strategic Accounts that the fill reduction was a price increase that Walmart would not agree to. He also told Blue Rhino's Director of Strategic Accounts that Walmart did not want to carry propane exchange tanks with different fill levels—that is, tanks at 15 pounds in stores serviced by Blue Rhino and tanks at 17 pounds in stores serviced by AmeriGas and Ozark.

37.     On or about April 29, 2008, a senior Blue Rhino manager ordered production managers to "stand down" on implementation of the fill reduction because "[t]he call with Walmart did not go according to plan."

38.     Blue Rhino followed its April 2008 communication plan and informed AmeriGas "well in advance" that it planned to raise prices in June 2008 by reducing the fill level in its exchange tanks from 17 to 15 pounds without a corresponding price decrease.

39.     On May 29, 2008, Blue Rhino proposed the fill reduction to Lowe's, Blue Rhino's largest retail customer. Approximately two weeks later, Lowe's agreed to accept 15-pound exchange tanks on the condition that Blue Rhino convert all of its customers, including Walmart, to 15-pound tanks of propane within 30 days.

40.     On June 18, 2008, Blue Rhino's President telephoned AmeriGas's Director of National Accounts. The two men called each other six more times over the next 30 hours. The following day, Blue Rhino account executives again discussed the fill reduction with Walmart. Following the last of these calls, Blue Rhino's President reported, "I've continued to have a lot of inquiries from [AmeriGas] regarding the lower fuel fill due to their need to adjust production. I've been told that it would be very challenging to produce two different size products long-term ... once again, messaging that they'll follow closely behind us in the market."

41.     On June 20, 2008, AmeriGas management produced a draft budget with a plan for reducing the fill level of AmeriGas's exchange tanks from 17 to 15 pounds.

42.     On or about June 25, 2008, Todd Brown, President of Blue Rhino and Senior Vice President of Sales and Marketing for Ferrellgas, Inc. called AmeriGas's president of sales and marketing to discuss the fill reduction again. Also on June 25, 2008, Blue Rhino began notifying its customers of its plans to reduce the fill level in its propane exchange tanks effective July 21, 2008.

43.     As alleged above, AmeriGas had previously considered and rejected a plan to unilaterally reduce the fill level in its propane exchange tanks. AmeriGas believed it could be competitively disadvantaged if other companies in the industry did not also reduce the fill level in their propane exchange tanks. After learning of Blue Rhino's plan to reduce the fill level of its exchange tanks, however, AmeriGas determined to collude with Blue Rhino to reduce the fill level in its propane exchange tanks.

44.     On or about June 26, 2008, Jay Werner of Blue Rhino and an AmeriGas employee discussed operational changes needed to implement the fill reduction. Representatives from the

two companies also discussed the timing of the first distribution of under-filled propane exchange tanks to their customers.

45.     By the last week of June 2008, Blue Rhino and AmeriGas formed an agreement on the fill reduction implementation plan. Blue Rhino would begin selling tanks with only 15 pounds of propane on July 21, 2008. AmeriGas would do the same on August 1, 2008.

46.     AmeriGas described the change in the propane tank exchange program to its employees in a memorandum dated July 15, 2008: "In an attempt to offset some of these expenses, achieve desired product margins, and maintain retail prices at an attractive level for consumers, AmeriGas Cylinder Exchange *and other national providers* are transitioning to a 15 pound cylinder. This slight decrease from current 17 pound levels *will quickly become the industry standard . . . .*" (Emphasis added.)

47.     In announcing the change to its production team, AmeriGas stated: "The cylinders will be filled with 3.5 gallons of propane versus the current 4 gallons. . . . *The major competitors in cylinder exchange will also be moving to a 15 pound cylinder* and as a result, it will become the industry standard." (Emphasis added.) The "other national providers" and "major competitors" in the propane exchange industry referred to by AmeriGas include primarily, if not solely, Blue Rhino.

48.     Blue Rhino remained concerned that if Walmart rejected the fill reduction, other major retailers would also reject the fill reduction on the grounds that they would be at a competitive disadvantage if the propane exchange tanks they sold contained less fuel than otherwise identical exchange tanks sold at Walmart.

49.     In particular, as detailed above, Lowe's, Blue Rhino's largest customer, had agreed to accept the fill reduction only on the express condition that all Blue Rhino customers

would also be forced to purchase 15-pound tanks within 30 days of Lowe's acceptance of the price increase.

50.     Initially, Walmart resisted the new 15-pound tanks.  From on or about July 10, 2008, and continuing for three months thereafter, Defendants colluded to force Walmart to accept the change. Sales executives from the two Defendants communicated repeatedly by telephone and email in order to coordinate their plan. They encouraged each other to stay loyal to their cartel and refuse to compete.

51.     For example, on or about July 11, 2008, Blue Rhino's Vice President of Sales called AmeriGas's Director of National Accounts. The two sales executives spoke at length by telephone. Internal Blue Rhino documents confirm that AmeriGas and Blue Rhino sales executives discussed Walmart's rejection of AmeriGas's proposal to begin shipping 15-pound exchange tanks.

52.     On or about July 21 and 22, 2008, Blue Rhino's Vice President of Sales and AmeriGas's Director of National Accounts spoke at length by telephone. Documents from Blue Rhino confirm that the AmeriGas and Blue Rhino sales executives discussed AmeriGas's plans for responding to Walmart's refusal to accept the fill reduction.

53.     On or about August 11, 2008, AmeriGas' Director of National Accounts, who was responsible for dealing with Walmart, called Blue Rhino's Vice President of Sales and told him that he was having trouble getting in touch with Walmart to discuss the reduction in fill levels.

54.     On or about August 13, 2008, the Blue Rhino sales executives discussed plans to implore AmeriGas to ensure that Home Depot, AmeriGas's largest retail customer, also accepted the fill reduction. The executives reasoned that Walmart would be more likely to accept the fill reduction if it knew that Home Depot had already done so.

55.     On August 21, 2008, Blue Rhino and AmeriGas sales executives spoke several times by telephone. Shortly after these communications, an AmeriGas sales executive and AmeriGas's operations manager directed their colleagues to ensure that the Home Depot store in Rogers, Arkansas (near Walmart's Bentonville headquarters) carried only 15-pound tanks.

56.     On September 2, 2008, Blue Rhino's Vice President of Sales and AmeriGas's Director of National Accounts spoke by telephone. They discussed the status of their respective efforts to convert their customers to 15-pound tanks, as well as the current retail pricing of tanks at Lowe's.

57.     On September 12, 2008, Blue Rhino's Vice President of Sales and AmeriGas's Director of National Accounts again spoke by telephone. They discussed the status of their negotiations with Walmart. Expressing frustration at Walmart's intransigence, AmeriGas's Director of National Accounts suggested that it was time to issue an ultimatum to Walmart. Blue Rhino's Vice President of Sales responded by telling him that Blue Rhino was continuing to work with Walmart and that AmeriGas should "hang in there."

58.     On September 15 and 22, 2008, Blue Rhino's Vice President of Sales and AmeriGas's Director of National Accounts again communicated by telephone.

59.     On September 30, 2008, AmeriGas's Director of National Accounts emailed Blue Rhino's Vice President of Sales and informed him that Walmart management was meeting the following day to discuss the proposed fill reduction.

60.     On October 6, 2008, the Lowe's buyer emailed his Blue Rhino sales executive with an ultimatum. As detailed above, Lowe's had agreed to accept 15-pound tanks on the condition that all other Blue Rhino customers would be converted within 30 days. Lowe's observed that Walmart was still selling 17-pound tanks and did not have to pay the price increase,

disadvantaging Lowe's. The Lowe's buyer demanded that Blue Rhino fill Lowe's tanks with 17 pounds of propane so long as Blue Rhino did so for any of its other customers.

61.     The Lowe's demand confirmed to Blue Rhino that it needed Walmart to immediately accept the fill reduction or risk the fill reduction scheme unraveling. It also highlighted the need for Blue Rhino and AmeriGas to continue their coordinated pressure on Walmart to accept the fill reduction.

62.     On October 6, 2008, Blue Rhino's President forwarded the Lowe's email to his Vice President of Sales and directed him to finalize Walmart's acceptance of the fill reduction that day. Within a half hour, the Blue Rhino Vice President of Sales called his counterpart at AmeriGas. The two talked for 16 minutes.

63.     Following his 16-minute conversation with the AmeriGas Director of National Accounts, the Blue Rhino Vice President of Sales emailed Walmart to demand that it accept the fill reduction.

64.     Early the following morning, the AmeriGas Director of National Accounts emailed Walmart with a similar message urging it to implement the fill reduction.

65.     On October 10, 2008, believing it had no option but to accept the fill reduction, Walmart acquiesced to the concerted demands of the Defendants and agreed to accept propane exchange tanks filled to 15 pounds from both Blue Rhino and AmeriGas.

66.     The secret agreement between Blue Rhino and AmeriGas that neither would deviate from their proposal to Walmart when faced with resistance from Walmart, along with their combined efforts to push Walmart to promptly accept the fill reduction, had the effect of raising the price per pound of propane to Walmart, Plaintiff, and the Class.

67.     Unlike large retailers such as Walmart, Lowe's and Home Depot, smaller retailers did not possess the power to resist Defendants' fill reduction plan and were forced to accept the reduction in exchange tanks from 17 to 15 pounds.

68.     The acts and practices of Defendants, as alleged herein, have the purpose, capacity, tendency, and effect of restricting or eliminating competition in the sale of propane in propane exchange tanks. Absent their unlawful agreement, Defendants would not have been able to reduce the fill levels of their tanks to 15 pounds.

69.     Defendants' conspiracy has continued until the present and remains ongoing. Both Defendants have continued to maintain the reduced fill levels despite the fact that propane prices have decreased substantially from their 2008 high.

## VII.    INJURY TO PLAINTIFF AND CLASS MEMBERS

70.     As described herein, as a result of Defendants' conspiracy, Plaintiff and class members paid more and continue to pay a higher price per pound for propane in propane exchange tanks than they would have paid in a competitive market.

71.     Plaintiff and class members purchased propane in propane exchange tanks directly from Defendants during the class period, and were injured thereby.

## VIII.   CLASS ACTION ALLEGATIONS

72.     Plaintiff sues on its own behalf and pursuant to Federal Rule of Civil Procedure 23(b)(3) on behalf of the following nationwide class:

> All persons or entities in the United States that directly purchased propane in propane exchange tanks for resale from one or more Defendants between July 21, 2008 and the present.

73.     Excluded from the proposed Class are Defendants, any entity in which Defendants have a controlling interest, Defendants' legal representatives, predecessors, successors, assigns, and employees, and any governmental entity.

74.     Plaintiff is a member of the Class it seeks to represent. Members of the Class can be identified using Defendants' records. Class members can be notified of the class action through publication, direct mailings and posted notices. Plaintiff reserves the right to modify the class definitions based upon discovery.

75.     The members of the Class are so numerous that individual joinder of all members is impracticable. Although the precise number of direct purchasers is unknown to Plaintiff at this time, given the nationwide scope of Defendants' business, the number of class members clearly exceeds the number that would make joinder practicable. Plaintiff believes that the members of the Class are so geographically diverse that joinder of all Class members is impracticable.

76.     Plaintiff's claims are typical of the claims of other Class members, as they arise out of the same course of conduct by Defendants. Plaintiff's interests are aligned with, and not antagonistic to, those interests of the other members of the Class. Accordingly, by proving Plaintiff's own claims, Plaintiff will prove other Class members' claims as well.

77.     There are common questions of law and fact specific to the each class that predominate over any questions affecting individual members, including:

    a.    Whether Blue Rhino and AmeriGas unlawfully contracted, combined and conspired to unreasonably restrain trade in violation of section 1 of the Sherman Act by reducing the fill level in propane exchange tanks from the then-standard 17 pounds to 15 pounds, without a corresponding price reduction.

b.     Whether Blue Rhino and AmeriGas unlawfully contracted, combined and conspired to unreasonably restrain trade in violation of section 1 of the Sherman Act by agreeing that neither would deviate from their proposal to reduce the fill level to Walmart or other customers;

c.     Whether Blue Rhino and AmeriGas unlawfully contracted, combined and conspired to unreasonably restrain trade in violation of section 1 of the Sherman Act by pushing Walmart to promptly accept the fill reduction;

d.     Whether the conduct of Defendants injured Plaintiff and members of the Class and if so, to what relief they are entitled;

e.     The appropriate measure of damages sustained by Plaintiff and members of the Class; and

f.     Whether injunctive relief is appropriate.

78.     Plaintiff and its counsel can and will fairly and adequately protect the interests of the Class. Plaintiff will vigorously pursue the claims and has no antagonistic conflicts. Plaintiff understands and appreciates its duties to the Class as a class representative under Rule 23 of the Federal Rules of Civil Procedure, is determined to diligently discharge those duties, and is committed to protecting the rights of absent Class members.  Plaintiff has retained counsel who are able and experienced class action litigators.

79.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(3) because common questions of law or fact predominate over any questions affecting only individual members. A class action is the superior procedural vehicle for fairly and efficiently adjudicating the claims asserted.

80. Resolution of this action on a class-wide basis is superior to other available methods and is a fair and efficient method for adjudicating the controversy. The Class is readily definable. Prosecution as a class action will eliminate the possibility of needlessly repetitious litigation. There would be substantial efficiencies to the Court and to the parties in litigating the common issues on a class-wide, instead of a repetitive individual, basis. Separate actions by individual Class members would also create a risk of inconsistent or varying judgments, which could establish incompatible standards of conduct for Defendants and substantially impede or impair the ability of Class members to pursue their claims. It is not anticipated that there would be difficulties in managing this case as a class action.

## IX. TOLLING OF STATUTE OF LIMITATIONS

81. Until the Federal Trade Commission filed its administrative complaint against Defendants in March 2014, Plaintiff did not know and through the exercise of diligence could not have known of the anticompetitive conduct alleged herein because Defendants conducted their conspiracy in non-public and confidential email exchanges and telephone calls. Defendants actively misled Plaintiff and the Class into believing that they had unilaterally decided to decrease the fill level of their propane exchange tanks; and they gave Walmart pretextual reasons for the reduction, citing technical complications with the fill level. Defendants concealed from Plaintiff and the Class their secret phone and email conversations in which they (1) jointly agreed to decrease the fill level, and (2) jointly agreed not to deviate from their plan to decrease the fill level, despite customer resistance. Defendants also concealed that they secretly and repeatedly verified with each other that each co-conspirator was adhering to their agreement to stand firm against any customer resistance to their fill reduction.

82.     On March 27, 2014, the FTC issued an administrative complaint against Defendants alleging that they colluded in 2008 to persuade their customers, including Plaintiff and the Class, to accept the tank fill reduction from 17 pounds to 15 pounds. The administrative complaint detailed phone calls and documents that Defendants had concealed from their customers, which evidence these unlawful acts. Plaintiff and the Class did not and could not have discovered Defendants' cartel until after March 27, 2014, when excerpts from these documents and summaries of these phone calls became available to the public.

83.     Accordingly, the statute of limitations presents no bar to any portion of the damage claims asserted by Plaintiff or the Class.

## X.     CLAIM FOR RELIEF:  VIOLATION OF SECTION 1 OF THE SHERMAN ACT

84.     Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

85.     Blue Rhino and AmeriGas, by and through their officers, directors, employees, agents or other representatives have entered into an unlawful agreement combination and conspiracy in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Specifically, Blue Rhino and AmeriGas have unlawfully agreed to reduce the fill levels of their tanks, thereby effectively raising the per-pound price charged for propane in those tanks.

86.     The conspiracy described herein constitutes an arrangement, contract, agreement, trust, or combination between Defendants made with a view or which tends to prevent full and free competition in the sale of propane in propane exchange tanks, and which was designed or which tended to advance or control the price per pound of propane in propane exchange tanks.

87.     Class members have been deprived of the benefits of free and open price competition.

88.     Defendants have undertaken this conduct in the United States and its territories.

89.     Defendants' business activities and operations involve and affect the interstate movement of propane and propane exchange tanks.

90.     As alleged herein, as a direct result of the conduct of Defendants, Plaintiff and Class members have been injured in their businesses and property as a result of Defendants' violation of Section 1 of the Sherman Act (15 U.S.C. § 1), for which they seek damages.

91.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and other members of the Class have been injured in that they paid more, per pound, to directly purchase the propane in propane exchange tanks than they otherwise would have paid in the absence of Defendants' illegal fill reduction agreement. As a proximate result of Defendants' conduct, Plaintiff and class members have been damaged in an amount to be proven at trial.

92.     The conduct of Defendants is continuing and will continue to impose antitrust injury on class members unless equitable relief is granted.

93.     The equitable relief outlined below is necessary to deter future antitrust violations, redress Plaintiff's and class members' injuries, and restore competition to the propane market.

## XI.     PRAYER FOR RELIEF

94.     WHEREFORE, Plaintiff, on behalf of itself and members of the Class, as applicable, request that the Court enter an order or judgment against Defendants including the following:

        a.     Certification of the action as a Class Action pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Plaintiff as the Class Representative and its counsel of record as Class Counsel;

b.    Defendants have combined and conspired in a *per se* violation of Section 1 of the Sherman Act (15 U.S.C. § 1), and that Plaintiff and members of the Class have been injured as a result of Defendants' violations;

c.    Plaintiff and members of the Class recover damages sustained by them, as provided by the federal antitrust laws, and that judgment in favor of Plaintiff and the Class be entered against Defendants, in an amount to be trebled in accordance with such laws;

d.    Plaintiff and members of the Class be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action as provided for by law or allowed in equity;

e.    An injunction requiring Defendants to cease their anticompetitive conduct;

f.    Plaintiff and members of the Class recover their costs in bringing this suit, including reasonable attorneys' fees and costs provided by law; and

g.    Plaintiff and members of the Class receive such other or further relief as may be just and proper in law or in equity.

XII.    JURY DEMAND

95.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues so triable.

DATED:        July 22, 2014

BERKOWITZ OLIVER WILLIAMS
SHAW & EISENBRANDT, LLP

By:    /s/ Tim J. Riemann
Tim J. Riemann, MO Bar #61757
2600 Grand Boulevard, Suite 1200
Kansas City, MO 64108
Tel:  (816) 627-0232
Fax:  (816) 561-1888
triemann@berkowitzoliver.com

David J. Guin
Tammy M. Stokes
Rex W. Slate
GUIN STOKES & EVANS, LLC
505 20th Street North; Suite 1000
Birmingham, Alabama 35203
Telephone: (205) 226-2282
Fax:  (205) 226-2357
davidg@gseattorneys.com
tammys@gseattorneys.com
rexs@gseattorneys.com

Charles R. Watkins
GUIN STOKES & EVANS, LLC
321 S. Plymouth Ct., Suite 1250
Chicago, IL  60604
Tel:  (312) 878-8391
Fax:  (205) 226-2357
cwatkins@gseattorneys.com

*Attorneys for Plaintiff*